IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

IN RE:  JOHNEY LEE & BENITA SUE GARRISON,      CASE NO. 1:08-bk-74072

         Debtors.

TIMBERLAND BANCSHARES, INC.          PLAINTIFF

VS.          1:10-ap-07061

JOHNEY L. GARRISON, BENITA SUE         DEFENDANTS
GARRISON, RENEE S. WILLIAMS, CHAPTER
7 TRUSTEE, & LACAMAS LABORATORIES, INC.

<u>MEMORANDUM OPINION</u>

      Timberland Bancshares, Inc. (Bank) initiated this adversary proceeding against Johney and Benita Garrison (Debtors),[1] Renee Williams (Trustee), and Lacamas Laboratories, Inc. (Lacamas).   The Bank seeks a declaratory judgment that it holds a valid perfected security interest in the Debtors' Lacamas stock that is superior to any interest held by the Trustee and all other parties.  Further, the Bank contends that the Debtors and Lacamas should be estopped from denying the validity of the Bank's security interest and requests a mandatory injunction directing the Debtors and Lacamas to convey all right, title, interest and equity in the stock to any buyer purchasing the stock in conformity with the Arkansas Uniform Commercial Code.

      Each defendant answered the complaint. Lacamas responded that the Bank's security interest is invalid because of a Stock Restrictive Agreement (SRA) between Lacamas

---

[1]When "Debtor" is used in the singular, the reference is to Johney Garrison.

1

shareholders and the corporation.  Lacamas counterclaimed for a declaratory judgment that the

Bank's security interest is null and void and requested an award of its attorney fees  in

accordance with the SRA.

The Trustee also asserted a counterclaim.  Pursuant to Section 544 of the Bankruptcy

Code, the Trustee claimed that the Bank's security interest in the Debtors' Lacamas shares  is

voidable by the Trustee because the security interest was not perfected upon the petition filing

and, therefore, inferior to the Trustee's interest as a hypothetical judgment lien creditor.  Further,

the Trustee seeks turnover of the shares of stock at issue.

The parties tried the lawsuit before the Court on February 1, 2011, in El Dorado,

Arkansas, after which the matter was taken under advisement following the submission of briefs.

The Court has jurisdiction to enter a final judgment in this case, which is a core proceeding in

accordance with  28 U.S.C. § 157(b)(2)(0) (2006).  The following opinion constitutesthe Court's

findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### FACTS

Most of the relevant events in this case occurred prior to the Debtors' Chapter 7

bankruptcy filing on October 10, 2008, and involve the Debtors' ownership and subsequent

pledge of shares of stock in Lacamas  as collateral for loans from the Bank.  Lacamas is an

Oregon corporation formed  in 1984-85  with funds contributed by four original shareholders,

including the Debtor and Dr. Allen S. Erickson, who currently serves as president. (Tr. at 112.)

Lacamas was formed as a Subchapter S corporation pursuant to  the Internal Revenue Code and

is subject to  restrictions on the  number of the corporation's shareholders. (Lacamas Ex. B.)

### The Stock Restrictions

2

In connection with their ownership interest in Lacamas, the Debtors were issued Stock Certificate Number 25, representing that John and Sue Garrison are registered holders of 104,625 shares of Lacamas stock with $1.00 par value on January 1, 1999. (Pl.'s Ex. 18.) The stock certificate bears the following language on its reverse side, which the Court will refer to as "the first restriction":

> The shares represented by this certificate have not been registered under the Securities Act of 1933. The shares have been acquired without a view to distribution and may not be offered, sold, transferred, pledged or hypothecated in the absence of an effective registration statement for the shares under the Act and under any applicable state securities laws, or an opinion of counsel to the corporation that such registration is not required as to such sale or offer. The stock transfer agent has been ordered to effectuate transfers of this certificate only in accordance with the above instructions.

Pl.'s Ex. 3, Pl's Ex. 18.

On December 20, 2001, the shareholders of Lacamas, including the Debtors, entered into the SRA with the corporation. (Lacamas Ex. A.)[2] The SRA detailed the means by which the corporation could redeem shares of stock from the shareholders and included the following restriction, which the Court will refer to as "the second restriction":

> NO LIFETIME TRANSFER: No SHAREHOLDER shall have any right to transfer, encumber, hypothecate, sell or dispose of any stock other than as contained herein without the express written consent of all signatories hereto. Any permitted transferee shall concurrently, with the issuance of said stock, sign an agreement to be bound by the terms and conditions of this Agreement.

Lacamas Ex. A.

Erickson testified that the purpose of the SRA was to restrict the number of shareholders to maintain the corporation's Sub-Chapter S status with the Internal Revenue Service. (Tr. at

---

[2]The copy of the agreement admitted into evidence was not executed by two of the eleven potential signatories, Katherene and Richard Bagwell.

3

113.)

## The Loans

Nine months after they signed the SRA limiting the transfer of the stock, the Debtors entered into a commercial line of credit agreement and note with the Bank for $55,035.00 on October 7, 2002. (Pl.'s Ex. 1.)   Collateral for the loan was described as "Assign of 104,625 Shares of Lacamas Laboratories, Inc. Stock #25 in the name of John L & B Sue Garrison, as joint tentants [sic] with right of survivorship . . . ."  (Pl.'s Ex. 1.)

 Ken Goudy was the Bank's loan officer who made this and subsequent loans to the Debtors. (Tr. at 20-21.)  The Debtors delivered Stock Certificate Number 25 to the Bank when they pledged their stock as collateral for the first loan on October 7, 2002. As mentioned above, the first restriction was described on the reverse side of the certificate but because the certificate was issued three years prior to the  December 2001 SRA, it made no mention of the second restriction agreed upon in the SRA.  (Tr. at 31.)

Goudy stated that  in connection with the  loans, the Bank maintained in its possession Stock Certificate Number 25, two Stock Assignments, and an Irrevocable Stock or Bond Power endorsed in blank by the Debtors.[3]  (Tr. at 24, Pl.'s 2, Trustee's Ex. 3, Pl's Ex. 18.)  Gary Burbank, the Bank's attorney, testified that the original stock certificate and stock power signed

_____

[3]Goudy testified that the Assignments and the Stock Power were received by the Bank when the  initial note was executed on October 7, 2002, and that these documents, along with the original Stock Certificate Number 25, have been continuously maintained in the Bank's possession until the time of trial.  (Tr. at 24.)  However, Goudy also testified he did not remember when he received  the first assignment, which is the document admitted into evidence as Plaintiff's Exhibit 2. (Tr. at 43. ) No explanation was ever given as to why the two stock assignments, evidenced by Plaintiff's Exhibit 2 and 18, referred to fewer than the 104,625 shares of stock in which the Bank took a security interest as recited in the first and all subsequent notes between the parties.  (Compare Pl.'s Ex. 1,2, & 18.)

in blank were maintained together in the Bank's records so that if the security agreement had to be foreclosed, the Bank was authorized by the documents to transfer the stock.  (Tr. at 99-100.)

Following the October 7, 2002 note, the Garrisons executed a second note in favor of the Bank for $100,035.00 on December 4, 2002, with a maturity date of March 4, 2003. (Pl.'s Ex. 4.)  The note recited that the collateral was an assignment of the 104,625 shares of Lacamas stock.   Additionally, the Note contained language granting the Bank a security interest in the listed collateral and stating that the Debtors granted the security interest free and clear of any other interest or adverse claim.  (Pl's Ex. 4 at 2.)

Both the first and second notes evidence that they were paid by renewal on February 11, 2003, and February 10, 2003, respectively.[4] (Pl.'s Ex. 1 & 4.)  After the October 7 and December 4, 2002  notes, the Bank entered into three successive loan transactions with Garrison Speciality Chemicals, Inc. (Garrison Inc.), the Debtors' corporation, to provide a revolving line of credit for working capital.

The Debtor  signed the  three notes  as president and CEO of the corporation.  Each of the three notes listed the Debtors' Lacamas stock as collateral, along with various other items of property. These loans were dated February 7, 2003, with  Garrison Inc. listed as the borrower of $250,000.00, a renewal note on December 5, 2003, and another renewal note on August 27, 2004, for $50,000. [5]  (Pl.'s Ex.5, 7,8.)

---

[4]The Bank did not submit as evidence any renewal note or notes dated either February 10 or 11, 2003.

[5]Between February of 2003, when the first note by Garrison Inc. was made, and December of 2003, when it was paid by renewal, the Debtors sold some of their shares of Lacamas stock and applied the proceeds to their indebtedness with the Bank in September-October of 2003.  This transaction will be discussed more fully below

The August 27, 2004 loan was paid by a renewal note for $250,150.00 signed by the Debtors individually on October 17, 2005.  (Pl.'s Ex. 9.) Collateral included the Debtor's shares of Lacamas stock.  A renewal note on November 27, 2006, from the Debtors individually to the Bank included  an additional advance, so that the amount borrowed was  $275,300.00.  (Pl.'s Ex. 10.)  Collateral included real estate and various items of personal property, including the Lacamas stock.

The November 27, 2006 note was paid on June 21, 2007, by a renewal note from the Debtors individually for $300,150.00.  (Pl.'s Ex. 11.)  The purpose of the loan was to refinance the previous loan and advance additional funds to the Debtors. The collateral for the loan included a security interest in the 104,625 shares of Lacamas stock and other personal and real property. The Debtors filed their Chapter 7 petition on October 10, 2008, at which time the obligation represented by the June 21, 2007 note remained outstanding.

### Consent to Stock Pledge

On February 7, 2003, a few days prior to the renewal of the first two notes to the Debtors and on the same date as the first note made by the Debtors' corporation,  Goudy received a facsimile transmission from the Debtor with an attached Consent to Stock Pledge.  (Pl.'s Ex. 12.) The first page of the facsimile contains a one-sentence message addressed to Goudy from the Debtor and informs Goudy that "Allen Erickson sent this pledge agreement to the other stockholders for their signatories [sic]." (Pl.'s Ex. 12.) The Debtor testified that the facsimile was sent in connection with the February 7, 2003 loan to the Debtors' corporation. (Tr. at 81.)

The Consent to Stock Pledge provides for the consent of the Lacamas stockholders  to the pledge of the Debtors' Lacamas stock to secure the Debtors' indebtedness to the Bank.  The

6

document recites that the consenting shareholders agree to the creation of a security interest but not to the conveyance of any rights of ownership in accordance with "Section 9 of the company's Stock Restrictive Agreement." (Pl.'s Ex. 12.) The Consent to Stock Pledge is the earliest document in evidence that informs the Bank about the existence of the second restriction in the SRA. [6]

The last paragraph states that the agreement was conditionally signed by Allen S. Erickson as president of the company but that if less than 51 percent of the voting stock agreed to the pledge, the consent is "null and void and no security interest will be transferred." (Pl.'s Ex. 12.) The agreement bears the signatures of Allen Erickson and John and Sue Garrison and Allen Erickson as president of the corporation. The signatures of the remaining eight shareholders are missing from the document presented into evidence, which has been maintained as the Bank's record.

Although Erickson and the Debtors signed the Consent to Stock Pledge, Erickson stated that their shares did not amount to 51% of the total shares of stock. He said that the other shareholders were resolutely opposed to signing the Consent to Stock Pledge. (Tr. at 113-14.) He informed the Debtor but not the Bank of the opposition to the Consent to Stock Pledge shortly after he consulted with the other shareholders. (Tr. at 115.)

The Bank never received a fully executed Consent to Stock Pledge or inquired about whether more signatures were needed or if additional signatures had subsequently been obtained. (Tr. at 44.) The Debtor admitted that, despite the fact that he was told by Erickson that he could

---

[6]The Debtor first testified Goudy knew of the SRA at the time of the initial loan, but later agreed on cross examination and redirect questioning that he was unsure when Goudy became aware of the SRA, but that it was no later than February of 2003. (Tr. at 78, 89.)

not pledge the stock as collateral, he proceeded to do so and received loan proceeds as a result. (Tr. at 91.)

### Sale of Stock

During early February 2003, the Debtor proposed to sell a portion of the Lacamas stock that served as collateral for his loans and apply the proceeds to his indebtedness to the Bank. (Tr. at 34, 53, 86.) Later in September or October 2003, Erickson helped the Debtors arrange a sale of a portion of their stock to two employees of Lacamas. (Tr. at 112.) The Debtors sold a "little less than 40,000 shares" with the Bank's knowledge and received $100,000.00, which was applied to their indebtedness at the Bank. (Tr. at 52-53, 55, 60, 77, 86- 87.) That $100,000.00 was the only payment ever made to the Bank by the Debtors, other than interest payments. (Tr. at 55.) Goudy did not recall if the source of the payment was Lacamas or the Debtors, but it is clear from his testimony that he knew the money was generated from the sale of some of the Debtors' Lacamas stock. (Tr. at 34, 52-53.)

In connection with the sale, Lacamas issued Stock Certificate Number 28 for 68,962.54 shares of common stock with a par value of $1.00 to John and Sue Garrison on October 14, 2003.[7] (Lacamas Ex. B.) On the reverse side of the certificate is a reference to the SRA dated December 20, 2001. Certificate 28 was delivered to the Debtors, who maintained it in their possession until they relinquished it to their attorney upon the bankruptcy filing. (Tr. at 84.)

Goudy testified that the Bank never received confirmation of a sale of the stock or a

---

[7]Subtracting the number of shares represented by Certificate 25 from the number of shares represented by Certificate 28 yields 35,662.46 shares of stock that the Debtors sold to other shareholders and/or employees in September or October of 2003.

request for the Bank to surrender the original stock certificate for reissuing of a replacement certificate for the balance of the shares still owned by the Debtors and encumbered by the Bank. Nor did the Bank release its lien although the attorneys for the Bank and Lacamas discussed a partial lien release.  (Tr. at 55.) Burbank testified that in his discussions with both  Erickson and Steve Cyr,  Lacamas'  attorney, neither questioned the validity of the Bank's security interest. (Tr. at 94.)

The Bank still holds the original certificate for 104,625 shares of Lacamas stock.  When asked how the new stock certificate could be issued without surrendering the original held by the Bank, Erickson stated, "I really wouldn't know that.  I would have left that up to Steve Cyr [Lacamas' attorney] to take care of." (Tr. at 116.)

### Post-Bankruptcy

Burbank stated that after the bankruptcy was filed, the Debtor initially offered to purchase the Bank's interest in the stock for $40,980.00.  (Pl.'s Ex. 15.)  Subsequently, both the Debtor  and Lacamas  challenged the Bank's security interest in the stock.  Burbank testified that in a January 29, 2010 email to Burbank,  Cyr  for the first time asserted Lacamas' position that the security interest was invalid as to Lacamas because of the  SRA. (Pl.'s Ex. 14, Tr. at 97.)

### DISCUSSION

Lacamas argues that the Bank's security interest in the Debtor's stock is invalid because of two separate restrictions prohibiting the Debtors from pledging their stock as collateral to the Bank

### First Restriction     .

The first of the two restrictions is set out on the reverse side of the stock certificate

evidenced by Plaintiff's Exhibit 18 and has been quoted in its entirety above. (See page 3.)  It gives notice that the Debtors' shares were not registered under the federal Securities Act of 1933, were acquired without a view to distribution, and may not be transferred without registration under applicable federal and state laws or a legal opinion that registration is not required. It further directs the stock transfer agent to effect transfers of the certificate only in accordance with these instructions. (Pl.'s Ex. 18.)   Lacamas contends that the stock has not been registered and the opinion of corporate counsel has not been provided as required by the restriction; therefore, the first restriction prohibits the pledge between the parties.

The Bank asserts that the restriction in the stock legend does not affect the validity of the security interest at issue because the Securities Act of 1933 and the Securities Exchange Act of 1934 create causes of action for parties in a securities sale transaction where a party is damaged by the fraud or misrepresentation of the seller or issuer. (Pl.'s Memorandum of Law, Feb. 22, 2011, at 6.)  The  Bank urges the conclusion  that because Lacamas does not allege fraud or contend that the Bank is either a seller or issuer as defined by the Securities Act of 1933, the restriction does not  apply to the transfer at issue.

The validity of a restriction on the transfer of stock is determined according to the law of the state of incorporation.  B & H Warehouse, Inc. v. Atlas Van Lines, Inc., 490 F.2d 818, 821 (5th Cir. 1974) (citing Palmer v. Chamberlin, 191 F.2d 532 (5th Cir. 1951); Restatement (Second) of Conflicts § 303 (1971)).  In the instant case, Lacamas was incorporated in the state of Oregon, which by statute permits restrictions on the transfer of shares of stock, with some conditions.

The applicable state law on stock transfer restrictions provides in relevant part:

(1) The articles of incorporation, bylaws, agreements among shareholders or agreements between shareholders and the corporation may impose restrictions on

10

the transfer or registration of transfer of shares of the corporation.  A restriction
does not affect shares issued before the restriction was adopted unless the holders
of the shares are parties to the restriction agreement or voted in favor of the
restriction.
(2) A restriction on the transfer or registration of transfer of shares  is valid and
enforceable against the holder or a transferee of the holder if the restriction is
authorized by this section and its existence is noted conspicuously on the front or
back of the certificate or is contained in the information statement required by
ORS 60.164 (2). Unless so noted, a restriction is not enforceable against a person
who has no knowledge of the restriction.
(3) A restriction on the transfer or registration of transfer of shares is authorized:
     . . .
     (b) To preserve exemptions under federal or state securities law; or
     (c) For any other reasonable purpose.

Or. Rev. Stat. Ann. § 60.167 (West 2003).

Applying this statute, the Court first observes that the record does not reflect whether the

first restriction was authorized by articles of incorporation,  bylaws, shareholder agreement, or

some other source not expressly enumerated in the statute.  Because there is no argument

otherwise, the Court assumes that Lacamas was authorized pursuant to Oregon law to issue the

certificates, and the corporation imposed the  restriction, which it disclosed through the legend

on the certificate, by a method that  satisfies Section 60.167(1) of the Oregon statute.

In accordance with section 60.167(2), the restriction is noted conspicuously on the

certificate, and this point is also not disputed.   The next question is whether the restriction

complies with  Section 60.167(3)(b) or (c)  of the Oregon statute because it preserves federal or

state securities exemptions or has some other reasonable purpose.

The analysis begins with  the 1933 Securities Act  referred to by the restriction under

consideration. See 15 U.S.C.A. §§ 77a-77aa (West 2009).   Generally, Section 5 of the 1933 Act

makes it illegal to sell a security without a proper registration statement, but the  Act also

provides for exemptions from registration in situations where registration would serve no

11

purpose.  Among the Act's many  exempted transactions are securities  transactions by any

person other than an issuer, underwriter or dealer[8] and securities transactions by the issuer (here,

the corporation) not involving any public offering.  15 U.S.C.A.  § 77d (1),(2) (West 2009).

Restricted securities, such as the ones in the instant case, include those acquired directly

or indirectly from an issuer in a transaction or chain of transactions not involving any public

offering.  Barkley Clark & Barbara Clark,  The Law of Secured Transactions Under  the Uniform

Commercial Code, Part I, Chapter 4, ¶ 4.13 (A.S. Pratt & Sons eds., 2010).  Issuers impose

restrictions on the transfer of restricted stock in order to qualify for the statutory exemptions

from registration such as the two discussed above.

In exercising reasonable care, issuers affix legends to restricted stock certificates that

detail the transfer  restrictions in order to prevent improper, non-exempt transfers.  A legend

regarding restrictions on the transfer of securities also  provides notice of the restrictions to those

"who regularly buy and sell such securities and those who regularly accept pledges of such

securities  as collateral for loans . . . ." Neidiger/Tucker/Bruner, Inc. v. Suntrust Bank, 530

S.E.2d 18, 21 (Ga. Ct. App. 2000).

The 1933 Act's registration requirements, general antifraud  provision, and liability

provisions are triggered by  sales or offers to sell securities.  2 Thomas Lee Hazen,  Law of

Securities Regulation § 5.1 (6th ed. 2009).   For purposes of the 1933 Act's antifraud provision,

---

[8] Issuer means "every person who issues or proposes to issue any security . . . ."
Underwriter means "any person who has purchased from an issuer with a view to, or offers or
sells for an issuer in connection with, the distribution of any security . . . ." Dealer means "any
person who engages . . . as agent, broker, or principal, in the business of offering, buying,
selling, or . . . trading in securities issued by another person."  15 U.S.C.A. § 77b (4), (11), (12)
(West 2009).

the United States Supreme Court has held that a pledge of securities as collateral for a loan is an "offer or  sale" of a security under the Act.  Rubin v. United States, 499 U.S. 424, 431 (1981). Rubin  dealt with the situation where the borrower committed fraud in pledging stock to the lender and then argued that he was not liable under the  Act's antifraud provision because the stock pledge in a commercial setting was not a "sale" as defined by the Act.

One commentator has convincingly explained that the effect of Rubin is that "if  the pledgee is a bank or other financial institution, the pledge would be exempt from registration . . . but nevertheless subject to the antifraud provisions."  Hazen, supra, § 5.1[5]  (citing 17 C.F.R. § 230.144(d)(4)(D); SEC v. Guild Films Co., 279 F.2d 485 (2d Cir. 1960)).  See also  Ahrendt v. Palmetto Fed. Sav & Loan Ass'n., 680 F.Supp. 1125, 1129 (S.D. Ohio 1987)(stating, post-Rubin, that a pledge of a security as collateral for a commercial bank loan does not constitute a sale of securities within the meaning of federal securities laws) (citing McClure v. First Nat'l Bank, 497 F.2d 490, 495-96 (5th Cir. 1974)(stating pledge of unregistered stock is only a sale if lender later forecloses and sells the securities upon default under circumstances that transform the lender into an underwriter)); Bronstein v. Bronstein, 407 F. Supp. 925, 930  (E.D. Pa. 1976) (recognizing that federal securities laws were designed to protect investors, not persons engaged in consumer or commercial loans); Clark &  Clark, supra,  ¶ 4.13[1]  (observing that pledge transaction is normally exempt from any registration requirements as a nonpublic offering under section 4(1) of the Act).  But see  Joslin v. Shareholder Servs.Grp., 948 F.Supp. 627, 634-35 (S.D. Tex. 1996) (holding that pledge of stock in violation of certificate restriction related to the 1933 Securities Act passed no interest to pledgee).

The burden of finding an exemption to registration is on the party who is the seller in the

transaction.  Clark & Clark, supra,  ¶ 4.13 [1].   Moreover, even if a securities transaction does

not comply with registration requirements,  "The Securities Act does not by its terms

automatically invalidate sales of unregistered securities in violation of registration requirements.

Rather, when unregistered securities are sold illegally, the Act simply grants the <u>buyer</u>  a remedy

in section 12(a)(1). 15 U.S.C.A. § 77l(1)." <u>ADM Corp. v. Thomson</u>, 707 F.2d 25, 27 (1st Cir.

1983).  With regard to protections under the Act,  one commentator has observed, "The purpose

of the Act is to protect, not penalize, such buyers; hence the lender will enjoy the benefits of the

Act vis-a-vis the pledgor."  Denis T. Rice, <u>The Effects of Registration Requirements on the</u>

<u>Disposition of Pledged Securities</u>, 21 Stan. L. Rev., 1607, 1619 (June 1969) (citing <u>Fox v.</u>

<u>Glickman Corp.</u>, 253 F. Supp.1005 (S.D.N.Y. 1966)).

Because the restriction under consideration also requires compliance with  registration

requirements under state  law, the Court has reviewed the Oregon statutes to determine if

registration of the stock pledge transaction is required.   Oregon securities law provides, "'Sale,'

or 'Sell' includes every contract of sale of, contract to sell, or disposition of, a security or interest

in a security for value"  but does not include "[a] bona fide pledge or loan of securities. . . ." Or.

Rev. Stat. Ann. § 59.015 (17)(a), ( c) (A) (West 2003).  The Court reads this provision to mean

that the term "sale" encompasses every type of securities transaction regulated under Oregon

law, and a bona fide pledge of securities is specifically excluded from that group of transactions.

Instructed by the foregoing principles and laws, the Court next turns to their application

to the first restriction in the instant case.  The purpose of the restriction, to preserve exemptions

under federal or state law, is expressly authorized by the statute.  Or. Rev. Stat. Ann. §

60.167(b).  But while the restriction is a valid, enforceable one under Oregon corporate law, the

restriction was not violated by the pledge in the instant case.   An analysis of the restriction as set out in the legend on the stock certificate will explain why.

The opening sentence in the legend recites that the shares represented by the certificate have not been registered under the Securities Act of 1933, giving notice to any potential transferee that the shares are  "restricted" as to how they may be transferred.  In the second sentence, the legend  recites that the shares were acquired "without a view to distribution," meaning that when Lacamas issued the shares to the Debtor, the corporation had no intent to distribute the shares in a public offering that would trigger the Act's registration requirements. As a closely-held corporation issuing  restricted stock in a private placement, the transfer of shares to the Debtor would have been  exempt from registration under section 4(2) of the 1933 Act.  15 U.S.C.A. § 77d(2).

The second sentence also  forbids the shares from being "offered, sold, transferred, pledged or hypothecated in the absence of an effective registration statement for the shares under the Act and under applicable state securities law, or an opinion of counsel to the corporation that such registration is not required. . . ." (Pl's Ex. 18.)  This is the crux of the restriction, and reading it out of context leads to the conclusion that the shares cannot be transferred without registration or corporate counsel opinion that registration is not required.  However, reading the restriction in the context of the 1933 Act, the Court interprets the restriction to mean the shares may not be "offered, sold, transferred, pledged or hypothecated" <u>in a public offering</u>  without registration or corporate counsel opinion because a public offering as a means of transfer would trigger the registration requirements.

Here, there is no evidence or argument to demonstrate that the pledge at issue is  a

"distribution" or public offering requiring registration.  Under the authorities consulted by the Court, either the pledge is totally outside the scope of the 1933 Act's registration requirements or it falls within one of the many  exemptions from registration that Congress has legislated. The most obvious of these applicable exemptions  is that the Debtors, as sellers-pledgors, are not issuers, underwriters, or dealers as defined by the statute. 15 U.S.C.A. § 77d (1). Therefore, the Debtors' pledge to the Bank would qualify as an exempted transfer.  As to state law registration requirements, the Oregon statute specifically excludes from regulation a bona fide pledge of securities as collateral for a loan, as in the instant case.

The Court concludes that while the restriction may be valid and enforceable under Section 60.167, the applicable Oregon statute,  by its terms it is not applicable to the transfer at issue.  The statute authorizes the restriction to  preserve the corporation's federal and state exemptions and that purpose is not furthered by prohibiting the pledge, which does not threaten the availability of those exemptions.  The pledge, being a transfer that is neither a public distribution nor a transaction by an issuer, underwriter or dealer, does not violate the restriction. The restriction remains in effect as to the Bank to the extent that any future transfer might necessitate the action of the stock transfer agent referred to in the legend.  The record does not contain any evidence that the stock transfer agent was required to take action by the pledge  at issue.

Lacamas argues that the first restriction prevents perfection of the Bank's security interest  pursuant to Arkansas law.  The applicable statute provides, "A restriction on transfer of a security imposed by the issuer . . . is ineffective against a person without knowledge of the restriction unless (1) the security is certificated and the restriction is noted conspicuously on the

security certificate. . . ." Ark. Code Ann.  § 4-8-204 (Michie 2001).

The Court first acknowledges that there are opposing views as to whether this type of restriction can even be characterized as having been "imposed by the issuer" because its purpose is to maintain compliance with the Securities Act of 1933.  See, for example,  Edina State Bank v. Mr. Steak, Inc., 487 F.2d 640 (10th Cir. 1973)(restrictions arising out of Securities Act are issuer-imposed; 8-204 applicable); DeWitt v. American Stock Transfer Co., 440 F. Supp. 1084 (S.D.N.Y. 1977) (distinguishing between restrictions imposed by issuer and those arising under federal Securities Act; 8-204 not applicable).

   Even if the Court were to find that this is a restriction imposed by Lacamas pursuant to Section 8-204, the restriction has no application to the private  transfer between the Debtor and the Bank for the same reasons enunciated with regard to the Oregon statute on transfer restrictions.  That being the case, the Court concludes that the first restriction has no effect on the Bank's security interest in the Debtors' stock.

### Second Restriction

Lacamas also argues that the SRA prohibited the Debtor's pledge of stock as collateral for the  loans from the Bank. Specifically, the SRA provides, "No shareholder shall have any right to transfer, encumber, hypothecate . . . any stock other than as contained herein without the express written consent of all signatories hereto."   (Lacamas Ex. A at 8.)  The  parties do not dispute that the SRA's list of prohibited transfers includes  the pledge at issue. Lacamas contends that because the requisite consent was not acquired,  the Bank's security interest in the shares of stock is not valid.

The Bank responds that Lacamas and the Debtors misled the Bank by implying that the

17

Consent to Stock Pledge removed any impediment to the transaction between the Bank and the Debtors. The Bank asserts that it remains perfected as to the collateral under theories of estoppel, apparent authority, or inconsistent positions.

In their arguments, the Bank and Lacamas rely on the previously-discussed Arkansas Code Annotated Section 4-8-204 as the applicable statute to determine the effect of the restriction. However, this provision is inapplicable because the stock restriction was not imposed by the issuer, i.e., Lacamas. Ark. Code Ann. § 4-8-204 (Michie 2001) (referring solely to transfer restrictions imposed by an issuer); U.C.C. § 8-204 cmt. 5 (stating that this U.C.C. section does not deal with stockholder agreements containing restrictions on the sale of a security); K & T, Inc. v. Koroulis, 888 P.2d 623, 626 (Utah 1994) (recognizing that U.C.C. Section 8-204 does not control the effectiveness of restrictions imposed by shareholder agreement).

Under the appropriate Oregon statute on share transfer restrictions, shareholders and the corporation may agree to impose restrictions on the transfer of shares of a corporation. Or. Rev. Stat. Ann. § 60-167(1) (West 2003). Even though the second restriction was adopted by the shareholders and corporation after the Debtors' Share Certificate 25 was issued, the restriction affects the shares held by the Debtors because as holders of the shares, they were "parties to the restriction agreement." Or. Rev. Stat. Ann. § 60.167 (1); Def. Lacamas Ex. A-1.

In accordance with Section 60.167, if a restriction is not noted on the front or back of the certificate, as in the instant case, it is only enforceable against a person with knowledge of the restriction. The record contains no evidence that the Bank ever received, nor that it requested, a copy of the SRA prior to the Debtors' bankruptcy. Nevertheless, from the

18

evidence adduced at the hearing, the Court concludes that the Bank had knowledge of the second restriction against transfer no later than February 7, 2003, the date when the Debtor sent the Bank a facsimile containing a one-sentence message and an attached Consent to Stock Pledge. (Pl.'s Ex. 12.)  According to the Bank's evidence, this document was  prepared by the corporation.  (Pl.'s Ex. 14, email from Gary Burbank.)

The Consent to Stock Pledge specifically refers to "Section 9 of the company's Stock Restrictive Agreement" but does not expressly recite what Section 9 states with regard to its prohibition of transfers. (Pl.'s Ex. 12 at 1.)  The document warns that if less than 51% of the voting stock agrees to the pledge, the pledge "shall be null and void and no security interest will be transferred."  (Pl.'s Ex. 12 at 1-2.)  According to Erickson's testimony, Erickson's and the Debtors' stock did not equal 51% of the voting stock. (Tr. at 113.)  The Debtors and Erickson were the only stockholders who signed the Consent to Stock Pledge.

The record does not reflect how many voting shares existed when the Consent to Stock Pledge was submitted to the Bank or how many SRA signatories were required to sign the Consent to Stock Pledge to meet the 51% requirement. The Consent to Stock Pledge may be inconsistent with the SRA because it requires the consent of only 51% of the voting stock, or an unknown number of signatories, whereas Section 9 of the SRA requires the express written consent of all nine of the signatories to the SRA out of a total of eleven shareholders.

The accompanying message from the Debtor to Goudy states that "Allen Erickson sent this pledge agreement to the other stockholders for their signatories [sic]."  The Bank argues that this statement was the Debtor's assurance that the requisite consent had already been acquired. However, the Court interprets the sentence to imply  that while more stockholder signatures

either might be or would be  forthcoming, the requisite number had not yet been received.  There

would be no point in acquiring more signatures unless the number of signatures acquired by

February 7 was insufficient to represent 51% of the voting stock.

Although the Consent to Stock Pledge may have communicated  misleading or

incomplete information with regard to  the requisite consent,  the Bank did not rely on the

document because it did not postpone the loan closing  until the remaining necessary signatures

were acquired pursuant to the dictates of the Consent to Stock Pledge. Inaccurate notice may

suffice to impart knowledge of a restriction on transfer.  See, e.g.,  Erlich v. Nyberg, 396 N.E.2d

1273, 1278-79 (Ill.App.Ct. 1979) (upholding the trial court's finding of plaintiff's actual

knowledge of restriction despite testimony that defendant only discussed a different restriction

with plaintiff prior to transfer; applying U.C.C. § 8-204).

 Thus, on February 7, 2003,  at 9:47 a.m., the Bank knew from the information disclosed

by the Consent to Stock Pledge that the proposed pledge of stock to the Bank was restricted by a

shareholder-corporation agreement;  the Bank knew that unless consent was received the

agreement prohibited the pledge; and the Bank knew from the  Debtor's attached message that

the required number of signatures signifying consent had not been acquired at that point in time.

Despite its knowledge, the Bank and the Debtors proceeded to enter into  the loan agreement

The state of the Bank's knowledge as to the Consent to Stock Pledge never changed

throughout the coming years as the Bank continued to extend credit to the Debtors and receive a

security interest in the stock as collateral. The Bank continued to know that it never received a

fully executed Consent to Stock Pledge and thus remained subject to the SRA. [9]

Having found the Bank had knowledge of the transfer restriction and that from February 7, 2003, forward,  the Bank was subject to it, the Court next turns to the statute to determine whether the restriction is authorized by Oregon law.  The statute expressly authorizes  a restriction that maintains "the corporation's status when it is dependent on the number or identity of its shareholders." Or.Rev.Stat.Ann. 60.167 (3)(a).  It also permits a transfer restriction that requires "the corporation, the holders of any class of its shares or another person to approve the transfer of the restricted shares if the requirement is not manifestly unreasonable. . . ." Or.Rev.Stat. Ann. 60.167 (4)( c).

The record shows that Lacamas was a Subchapter S corporation.  (Lacamas Ex. B.) Erickson testified that the purpose of the SRA was to restrict the number of shareholders to maintain the corporation's tax status in accordance with Internal Revenue Service regulations. (Tr. at 113.)  Such a purpose conforms to section 60.167(3)(a) of the Oregon corporate code. Requiring that shareholders approve the transfer of shares is not manifestly unreasonable, considering that shareholders' approval is a means to monitor and control the number and character of the corporation's shareholders.  Because the SRA complies with section 60.167 of the Oregon corporate code, it is valid and enforceable.

Since the restriction is valid and enforceable under Oregon law, the question then becomes what is the effect of the restriction on the perfection of the  Bank's lien.  A security

---

[9]See, for example, Goudy's testimony in which he admitted that when the October 17, 2005 loan was extended to the Debtors, he knew of the SRA based on the Consent to Stock Pledge.  (Tr. at 52, Pl.'s Ex. 9.)

interest in a certificated security is perfected by possession of the instrument by the secured

party.  Ark. Code Ann. § 4-9-313(a) (Michie 2001); Or.Rev.Stat.Ann. § 79.0313(1)  (West

2003).  In this case, the Bank has possession of the instrument.

However, attachment  is a necessary precondition to the perfection of a security interest.

Ark. Code Ann. § 4-9-308(a) (Michie 2001); Or.Rev.Stat.Ann. § 79.0308(1) (West 2003).  A

security interest attaches to collateral only if "the debtor has rights in the collateral or the power

to transfer rights in the collateral to a secured party." Ark. Code Ann. § 4-9-203(b)(2) (Michie

2001); Or.Rev.Stat.Ann. § 79.0203(2)(b) (West 2003).  "[A] security interest attaches only to

whatever rights a debtor may have, broad or limited as those rights may be." U.C.C. § 9-203 cmt.

6. Accord  In re Weiss, 376 B.R. 867, 876 (Bankr. N.D. Ill. 2007) (asserting that transfer of

security interest to secured party did not occur because debtor did not have rights in the

collateral due to lack of prior consent of other parties to agreement that controlled the procedure

for transfer of debtor's interests)(citing U.C.C. § 9-203(b)(2), (3) & cmt. 2; 810 ILCS 5/9-

203(b);  Prior v. Farm Bureau Oil Co. (In re Prior), 176 B.R. 485, 496 (Bankr.S.D.Ill. 1995);

Am. Nat'l Bank & Trust Co. v. Matrix IV, Inc. (In re S.M. Acquisition Co.), 296 B.R. 452, 463-

64 (Bankr. N.D. Ill. 2003)).

Applying these rules regarding attachment and perfection, the Court finds that when the

Debtors attempted to give the Bank a security interest in their stock, they had already voluntarily

agreed to refrain from pledging  the stock without unanimous consent of the other signatories to

the agreement.  The Debtors having conditionally relinquished their transfer rights, the security

interest could not attach to those rights and without attachment, perfection could not be

accomplished.  Accordingly, the Bank's lien in the stock is unperfected unless the Bank's

estoppel and apparent authority arguments have merit, issues to be subsequently discussed.

Alternatively, an argument can be made that a transferee with knowledge of a restriction is not a "bona fide purchaser" (under current law, a "protected purchaser" pursuant to Ark. Code Ann. § 4-8-303 (Michie 2001); Or. Rev. Stat. Ann. § 78.3030(1)(a)-(c) (West 2003)).  The Trustee, in her post-trial brief, relies on this and other Arkansas commercial code provisions on perfection, adverse claims and protected purchasers to argue that the Bank is unperfected in the stock.

Courts have held that a transferee with knowledge of a restriction takes with notice of an adverse claim and is not accorded the protection of the statute.  See, e.g., K & T, Inc., 888 P.2d at 626 (recognizing that restriction at issue was generated by shareholder agreement and its effect would be governed by U.C.C. provision 8-302 regarding bona fide purchasers); Joslin, 948 F.Supp. at 634 (concluding that transferee was not a bona fide purchaser because it had notice that transfer was prohibited by valid restriction under U.C.C. Section 8-302; transfer passed no interest to transferee).

The Court recognizes that whether the restriction is an adverse claim depends on whether a person's property interest in a financial asset would be violated if another person held, transferred, or dealt with the financial asset.  Ark. Code Ann. § 4-8-102(a)(1) (Michie 2001); Or. Rev. Stat. Ann. § 78.1020(1)(a)(West 2003).  To follow this line of reasoning to its conclusion would unnecessarily lengthen the Court's opinion since the Court has already decided that attachment did not occur unless the Bank's theories of estoppel and apparent authority prevail. Therefore, the Court declines to consider whether the Bank was a protected purchaser or a purchaser who took with notice of an adverse claim.

23

### Estoppel

The Bank contends that Lacamas should be estopped from relying on the restriction to invalidate the Bank's security interest on the basis of two legal theories: inconsistent positions taken by Lacamas and the apparent authority of the Debtor.

Generally, equitable estoppel comprises the following elements: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe the other party so intended; (3) the party asserting estoppel must be ignorant of the facts; and (4) the party asserting estoppel must rely on the other's conduct to his detriment. Felton v. Rebsamen Med. Ctr., Inc., 373 Ark. 472, 481, 284 S.W.3d 486, 493 (2008); King v. Powell, 85 Ark. App. 212, 224, 148 S.W.3d 792, 799 (2004)(citing Brown v. Brown, 83 Ark.App. 217, 125 S.W.3d 840 (2003)).

The party seeking estoppel has the burden to prove all four elements. Design Prof'l Ins. Co. v. Chicago Ins. Co., 454 F.3d 906, 912-13 (8th Cir. 2006) (citing Shelter Mut. Ins. Co. v. Kennedy, 347 Ark. 184, 187, 60 S.W.3d 458, 460 (2001)).

The third element requiring the estopping party to be ignorant of the facts also prohibits a party from claiming estoppel "as to facts which he ought in the exercise of reasonable prudence to know." Carter v. Aetna Casualty & Surety Co., 473 F.2d 1071, 1078 (8th Cir. 1973) (citing Keneally v. First Nat'l Bank, 400 F.2d 838, 843 (8th Cir. 1968)). Thus, the doctrine is inapplicable where the detriment results from carelessness or ignorance of the law on the part of the party asserting estoppel. Whitley v. Irwin, 250 Ark. 543, 547, 465 S.W.2d 906, 909 (1971) (citing Exchange Bank & Trust Co. v. Gibbons, 228 Ark. 454, 307 S.W.2d 877)(1957)).

As to the fourth element requiring a showing of reliance by the party claiming estoppel,

24

that reliance must be reasonable. <u>Nash v. Landmark Storage LLC</u>, 102 Ark. App. 182, 186 283 S.W.3d 605, 609 (2008)(citing <u>Bharodia v. Pledger</u>, 340 Ark. 547, 11 S.W.3d 540 (2000)).  The type of conduct relied upon can be silence, but there must exist an opportunity and a duty to speak and knowledge that the other party is relying on that silence to his detriment. <u>Willis v. Rice (In re Willis)</u>, 345 B.R. 647, 652 (B.A.P. 8th Cir. 2006);  <u>J.W. Reynolds Lumber Co. v. Smackover State Bank</u>, 310 Ark. 342, 349, 836 S.W.2d 853, 856 (1992)(citing <u>Lavaca Sch. Dist. No. 3 v. Charleston Sch. Dist. No. 9</u>, 304 Ark. 104, 800 S.W.2d 703 (1990)).

The Bank argues that Lacamas should be estopped from enforcing the restriction because it took an inconsistent position that was misleading to the Bank and  put  the Bank at a disadvantage that was then asserted against the Bank.   The doctrines of inconsistent positions and judicial estoppel are often used interchangeably by courts and commentators. <u>See, e.g.,</u> <u>Breckenridge v. Breckenridge</u>, No. CA 09-1035, 2010 WL 1233470, at *8 (Ark. App. March 31, 2010)("[t]he doctrine of inconsistent positions, more commonly referred to in recent case law as the doctrine of judicial estoppel").  However, the Arkansas Supreme Court has explained that the doctrine of inconsistent positions is broader than judicial estoppel and may apply to positions taken outside of litigation.  <u>Dupwe v. Wallace</u>, 355 Ark. 521, 531, 140 S.W.3d 464, 471 (2004). Thus, taking an inconsistent position may constitute a type of conduct that would support a finding of estoppel.

Under the general principles of equitable estoppel, the Court concludes the Bank did not prove facts to support its theory.  In February 2003,  the Bank knew that a restriction on the Debtors' ability to pledge the stock existed, that the Consent to Stock Pledge was not adequately executed, and that more signatures either were being procured or might be procured in the future.

The Bank entered into a loan agreement with the Debtor's corporation despite the knowledge that the necessary signatures representing shareholder consent had not been obtained. The Bank also knew, during the years it repeatedly lent money to the Debtors or their corporation, that it never received an adequately executed Consent to Stock Pledge.

Taking these facts into account, the Court concludes that the Bank had the information it needed to determine that the Debtors' stock was not suitable collateral because of the second restriction, even though the Debtors, when entering into the various security agreements, misrepresented the extent of their ability to pledge the stock. (See Pl.'s Ex. 4 at 2, second note to Bank, stating stock was owned by Debtor free and clear from any other interest or claim.)

Despite the Debtors' misrepresentations and any alleged failure on Lacamas' part to later inform the Bank that shareholders failed to consent to the pledge, it was the Bank's carelessness or lack of reasonable prudence that resulted in its present predicament. Because of the Consent to Stock Pledge in its possession, the Bank had enough information from February 7, 2003 forward that the third prong of estoppel requiring ignorance on the part of the estopping party is not satisfied. Furthermore, given the Bank's knowledge, its reliance on any assurances by the Debtor was not reasonable under the fourth prong.

**Estoppel by Inconsistent Position**

Under similar reasoning, the Court finds that estoppel by inconsistent position is not applicable in this case. At some point on or after February 7, 2003, Lacamas learned of the Debtors' pledge of their stock to the Bank despite the refusal of shareholder consent. The Bank argues that when the Debtors decided to sell a portion of their stock, Lacamas approached the Bank to negotiate the partial release of the Bank's lien, an inconsistent position if Lacamas also

26

claimed  the SRA prevented  the attachment of the lien in the first place.

Relevant to a determination of this issue is the testimony of Gary Burbank, an attorney for the Bank who testified that the Debtor and Erickson contacted the Bank about selling some of the Debtor's stock in September 2003 and partially releasing the Bank's lien.  (Tr. at 93.)

Subsequently, Burbank contacted Steve Cyr, Lacamas' attorney, "and I had more than one conversation with Mr. Cyr about how we go about making a partial release of our security interest in order to permit a stock sale . . . ." (Tr. at 93.)  Burbank testified on direct examination that during these discussions, there was no mention of  "any sort of defect or problem with the security interest."  (Tr. at  94.)

Upon cross examination by Cyr, who was Lacamas' counsel at the trial,  Burbank was asked whether he remembered Cyr's comment to him during the discussions in September 2003 that the security interest was questionable but that Erickson "wanted to jump through all hoops." (Tr. at 101.)  Burbank replied,

> No, sir, I don't. . . . Mr. Cyr, I remember you talking about the stock restriction in connection with the sale of the stock and that you would - - you would need to comply with that in the way it was transferred, but I . . . really don't. And I'm 58 or 59, I guess–and could have forgotten it, but I don't remember that.

Tr. at 101.

Despite the discussions,  the Bank was not asked to surrender the stock certificate so  that certificates reflecting new ownership could be issued, the Bank never received an official notice of the sale of the stock, and the Bank did not execute a partial release of lien.  However, the Bank was aware that a stock sale had taken place and that the payment on the Debtors' indebtedness to the Bank was derived from proceeds of the sale.

More than seven years have passed since Burbank's conversations with Cyr, and

27

Burbank candidly conceded that he "could have forgotten" the reservations concerning the security interest that were allegedly expressed by Cyr during their exchange. The Court places little weight on Burbank's testimony that, upon cross examination, was tentative on this point.

Further, the fact that Burbank and Cyr discussed a partial lien release is not sufficient evidence that Lacamas intended to mislead the Bank into believing Lacamas recognized the purported lien. Certainly, the discussions presented Lacamas with the opportunity to voice its reservations about the security interest. But Lacamas was aware that the Bank had already proceeded with the loan transaction despite the lack of shareholder consent. Lacamas' purported silence did not conceal that pivotal fact from the Bank.

As to why Lacamas inquired into the possibility of a partial release of lien if Lacamas did not recognize the lien, this question was not posed to Erickson when he testified. The Court can only speculate why the corporation felt it necessary to discuss the disputed lien with the Bank. At any rate, after the conversations between Cyr and Burbank, a notice of sale was not sent to the Bank, and the partial lien release was not effected. These circumstances suggest that Lacamas did not follow through because it had concluded neither document was necessary since the Bank held no legally cognizable interest in the stock. Even if this conclusion were wrong, it would still be consistent with Lacamas' position at trial that the SRA prohibited the stock pledge.

Furthermore, the Court concludes that estoppel is not supported by the fact that Lacamas issued new stock certificates representing the same stock as that represented by Certificate 25 held by the Bank. Certificate 25 bears the following language on its face:

> This certifies that John L. Garrison and Sue Garrison . . . [are] the registered holder[s] of One Hundred Four Thousand Six Hundred Twenty-five Shares of . .

28

> . common stock transferable only on the books of the Corporation by the holder
> hereof in person or by Attorney upon surrender of this Certificate properly
> endorsed.

Pl.'s Ex. 18.

The Oregon Court of Appeals has expressly held that when a stock certificate itself requires a surrender of the certificate before shares can be transferred, this requirement has legal effect consistent with Uniform Commercial Code provisions regarding acquisition of a security. Helton v. Phillips, 963 P.2d 100, 104 (Or. Ct. App. 1998) (stating the rule is consistent with the Oregon Uniform Commercial Code; citing Or. Rev. Stat. Ann. §§ 78.1040(1)(a) & 78.3010(1)(a) (West 2003)).  See, also, the identical provisions under Ark. Code Ann. §§ 4-8-104(a)(1) & 301(a)(1) (Michie 2001) (providing that a person acquires a security if the person is a purchaser to whom a security is delivered; delivery of a certificated security occurs when the purchaser acquires possession of the security certificate).

Lacamas failed to comply with its own requirement that the certificate must be surrendered prior to the transfer of the shares it represented and instead issued new stock certificates to the purchasers and the Debtors.  By this conduct, Lacamas was apparently attempting to effect a stock transfer without having to directly confront the Bank about surrendering original Stock Certificate 25 in the Bank's possession.   However, as testified to by Goudy, the Bank knew the stock was sold and that it received the proceeds to apply to the Debtors' indebtedness.  Thus, the Bank was not ignorant of the facts regarding the sale even though  proper procedures for transferring the stock were not complied with.  Despite its knowledge, the Bank continued to accept 104,625 shares of stock as collateral for all subsequent loans to the Debtors. Therefore, the Bank did not reasonably rely.

## Apparent Authority

Further, the Bank argues that the Debtor Garrison was a board member and an agent of Lacamas throughout all of the transactions with the Bank and that he had apparent authority to bind Lacamas as to statements or representations he made about his ability to pledge the stock.[10] The Bank contends that any act by Lacamas that caused the Bank to rely on Garrison's assurances with regard to his stock makes those statements binding on Lacamas.

For an agency relationship to exist, one person, the principal, consents that another person, the agent, will act on behalf of and subject to the principal's control, and the agent consents to so act. Sterne, Agee & Leach v. Way, 101 Ark. App. 23, 29, 270 S.W.3d 369, 375 (2007) (citing Reed v. Smith Steel, Inc., 77 Ark. App. 110, 78 S.W.3d 118 (2002)); Eads v. Borman, 227 P.3d 826, 329 (Or. App. 2010)(citing Vaughn v. First Transit, Inc., 206 P.3d 181 (2009) (quoting Hampton Tree Farms v. Jewett, 892 P.2d 683 (1995))). Thus, two elements--the principal's control of the agent's acts and the consent of both parties--are necessary to the agency relationship.

Apparent authority "is relevant only if actual agency has already been established." Eads, 227 P. 3d at 831, n. 5 (quoting Kotera v. Daioh Int'l U.S.A. Corp., 40 P.3d 506 (Or. App. 2002)). The Court need not further discuss apparent authority because the Bank did not prove the requisite actual agency relationship between the Debtor and Lacamas. First, the Bank does not

---

[10]Goudy testified that during the negotiations for the February 7, 2003 loan, the Debtor purported to be serving on the board of Lacamas. (Tr. at 45.) The Debtor testified he was not a member of the corporate board during the relevant period, (Tr. at 69), and the Consent to Stock Pledge reflects that he was not an officer of the corporation. The record is inconclusive on this point.

show how the corporation, as principal, exerted control over the Debtor, as agent, as to the Debtors' dealings with the Bank.  Second, the record does not demonstrate  mutual consent for the Debtor to act on Lacamas' behalf.  The fact that the Consent to Stock Pledge necessitated Erickson's signature shows that the Debtor did not have authority to  independently consent to the transfer  on Lacamas' behalf.   For that matter, the Consent to Stock Pledge makes it clear that the corporation's consent alone was ineffective to remove the restriction, which arose as a result of an agreement between the corporation and nine of the eleven Lacamas shareholders. The Bank does not contend that the Debtor, as agent for Lacamas, could also bind each shareholder as to consent to the restricted transfer.

The Debtors  borrowed money for their private purposes and not on behalf of or to benefit Lacamas.  Under the Uniform Commercial Code, "a person who transfers a certificated security to a purchaser for value warrants to the purchaser . . . that . . . the transfer does not violate any restriction on transfer." Ark. Code Ann. § 4-8-108(a)(4) (Michie 2001); Or. Rev. Stat. Ann. § 78.1080(1)(d) (West 2003).   Unquestionably,  the Debtors violated this statute when they entered into the loan agreement with the Bank, but no evidence supports the conclusion that they did so with the consent and under the control of Lacamas. Thus, the Court will not impute to Lacamas the Debtors' misrepresentations, in their loan documents or otherwise, on the basis of actual agency.

### Trustee's Counterclaim

 Pursuant to Sections 544(a), 542, and 550 of the Bankruptcy Code, the Trustee seeks avoidance  of the Bank's security interest in and turnover of 68,962.54 shares of Lacamas stock, which represents the portion of the Debtor's stock that was not sold to third parties in the

31

September-October 2003 transaction.

Section 544(a)(1) gives a trustee the rights and powers of a hypothetical judicial lien creditor to avoid the transfer of an unperfected inferior interest in the debtor's property. 11 U.S.C. § 544(a)(1) (2006); Eastern States Life Ins. Co. v. Strauss (In re Crawford), 274 B.R. 798, 804 (B.A.P. 8th Cir. 2002). This Code section permits a trustee to avoid prepetition liens that were not perfected in accordance with state law prior to the bankruptcy filing. In re Renaud, 302 B.R. 280, 283 (Bankr. E.D. Ark. 2003) (citing Shuster v. Doane, 784 F.2d 883, 884 (8th Cir. 1986)), aff'd, 308 B.R. 347 (B.A.P. 8th Cir. 2004).

Section 550(a) of the Bankruptcy Code provides in relevant part that "to the extent that a transfer is avoided under section 544 . . . the trustee may recover, for the benefit of the estate, the property transferred . . .." 11 U.S.C. § 544(a) (2006). Pursuant to the turnover statute, an entity with possession, custody, or control of property that the trustee may use, sell, or lease is required to deliver such property to the trustee. 11 U.S.C. § 542(a) (2006).

As the Court has discussed above, the security interest in the stock did not attach to the Debtors' rights in the collateral; therefore, perfection did not occur. Accordingly, the Court rules that the Trustee is entitled to avoid the transfer of a security interest in the Debtor's stock because the Bank's security interest was not perfected prior to the bankruptcy filing. Therefore, pursuant to Section 550(a), the Trustee may recover from the Bank the Debtor's Lacamas stock as represented by Stock Certificate 25. The stock is also represented by Stock Certificate 28, and the Trustee is entitled to turnover of Certificate 28 in the Debtors' possession in accordance with 11 U.S.C. §542(a).

**Attorney Fees**

32

In its Answer and Counterclaim, Lacamas asks for its attorney fees pursuant to Section 14 of the SRA.  This Section of the agreement provides that if suit is commenced to enforce any of the  terms of the agreement, the prevailing party may recover its legal fees from the other parties. The SRA also provides that it will be construed under the laws of the State of Oregon. (Def. Lacamas Ex. A.)

Oregon law holds that a party is entitled to recover attorney fees only if a statute or contract confers that right. Mattiza v. Foster, 803 P.2d 723 (Or.1990)(citing Lewis v. Dept. of Rev., 653 P.2d 1265 (1982); Riedel v. First Nat'l Bank, 598 P.2d 302 (1979);  Hughes v. Bembry, 470 P.2d 151 (1970)).  Attorney fee provisions in a contract apply only to the parties to the contract. See Hayes v. Adair Homes, Inc., 206 P.3d 1062, 1063 (Or. App. 2009) (concluding that trial court erred in awarding fees to all prevailing plaintiffs when only two of the plaintiffs were parties to the contract containing the attorney fee provision; nonparties to the contract, although prevailing plaintiffs, were not entitled to the fee award), review denied, 217 P.3d 688 (Or. 2009). Although the Hayes case dealt specifically with prevailing plaintiffs who were denied attorney fees because they were nonparties to a contract awarding attorney fees, the same reasoning would apply to a losing party in a lawsuit who was not a party to a previous contract allowing for the recovery of  attorney fees.

In the instant case, the Debtors, not the Bank, were the parties who breached the terms of the SRA by pledging their stock to the Bank without consent of the other parties to the contract. Applying Oregon law, the Court determines that because the Bank was not a party to the SRA, which is the contract conferring the right to recover attorney fees, Lacamas may not recover its attorney fees from the Bank.

## CONCLUSION

The Court finds that the Bank's security interest in the stock at issue is invalid because of the Stock Restrictive Agreement, and the Court further finds that Lacamas is not equitably estopped from denying the security interest. Therefore, the Court rules that the Bank's complaint for declaratory judgment is denied. The Bank's request for a mandatory injunction directing the Debtors and Lacamas to convey all right, title, and interest in the stock to a buyer purchasing the stock in conformity with the Arkansas Uniform Commercial Code is denied. Lacamas' counterclaim seeking a declaratory judgment that the Bank's security interest in the stock is null and void is granted. Lacamas' request for its attorney fees is denied.

The Trustee's counterclaim to avoid the Bank's security interest is granted. The Bank and the Debtor will forthwith deliver to the Trustee Stock Certificates 25 and 28.[11] The Trustee is further directed to take whatever legal or ministerial action deemed necessary to satisfy the applicable Oregon statutes and case law with regard to transfer of shares and surrender of certificates to effect transfers. The Court recognizes that the Trustee has specifically reserved for further proceedings the question of whether, in liquidating the stock, she is bound by the restrictions.

IT IS SO ORDERED.

Dated:  11/16/2011

THE HON. JAMES G MIXON
UNITED STATES BANKRUPTCY JUDGE

---

[11]These certificates are currently in the custody of the Court as Plaintiff's Exhibit 18 and Trustee's Exhibit 1.

34

cc: Frederick S. Wetzel, Esq.
   Steven M. Cyr, Esq.
   Thomas S. Streetman, Esq.
   Renee S. Williams, Esq., Trustee
   Robert Depper Esq.
   Johney Lee and Benita Sue Garrison, Debtors

.